UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,   :

      -v.-   :   12 Cr. 180 (FM)

SHEPARD FAIREY,   :

      Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

                      PREET BHARARA
                      United States Attorney
                      Southern District of New York

Of Counsel:
    Daniel W. Levy
    Assistant United States Attorney



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*

September 2, 2012

<u>By ECF and Hand</u>
The Honorable Frank Maas
United States Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 740
New York, New York  10007-1312

> Re:  <u>United States v. Fairey</u>
>       12 Cr. 180 (FM)

Dear Judge Maas:

      The Government respectfully submits this Sentencing Memorandum in advance of the sentencing of defendant Shepard Fairey (the "defendant"), currently scheduled for Friday, September 7, 2012, at 10:00 a.m.

      For the reasons set forth below, the Government respectfully requests that the Court sentence the defendant to some term of imprisonment.  The Government further requests that the Court also impose a fine.

      For ease of reference, attached hereto is Exhibit A, which contains the various images referred to in this Sentencing Memorandum and in the Presentence Report, dated August 30, 2012 (the "PSR").

I.      <u>Objections to the Presentence Report</u>

      The Government objects to the factual portion of the PSR to the extent noted below and has limited its objections to only those facts most relevant to the Court's balancing of the factors required to be considered by 18 U.S.C. § 3553(a).

      <u>¶ 8 (page 4 n.1)</u>:  The PSR asserts that "[n]o part of the original photograph was contained in the defendant's artwork rather, he hand illustrated the image while referencing the photograph."  The Government objects to this statement and requests that this sentence be stricken because resolving this complicated factual issue is irrelevant to this criminal case.

The Honorable Frank Maas
September 2, 2012
Page 2

In the context of the civil litigation, there was a time-consuming dispute over whether the defendant hand illustrated the Obama image contained in the Obama Progress Work and the Obama Hope Work (collectively, the "Obama Works") or whether he digitally traced the reference photograph to create the Obama Works.  Indeed, the fake documents that the defendant manufactured sought, in part, to demonstrate that the defendant hand illustrated the Obama image in the works.  An expert in graphic design retained by the AP concluded to the contrary, specifically, that the defendant most likely used an all-digital, computer-based illustration technique and that his process in creating the Obama Works was, in effect, to trace the Obama Photograph and then make a series of additional slight changes.  The fact remains that the Obama Progress Work and the Obama Hope Work were both iconic works of art that struck a chord in the American public leading up to the November 2008 election and since.  The fact also remains that both works bear a striking resemblance to the Obama Photograph, as can be easily seen through the overlay of one of the Obama works onto the photograph reproduced below. The Court simply need not resolve this factual dispute to sentence the defendant and the sentence should, therefore, be stricken.



**¶ 10 (page 5 n.3):**  The PSR asserts that the defendant's "estimated profit from the Obama Works was $150,000, which he considered modest in comparison to" funds generated by the work that he donated to charity.  Because the Court need not resolve any dispute regarding the estimated profits earned by the defendant as a result of the Obama Works or the precise amount of his charitable donations, the Government objects to this statement and requests that this sentence be stricken.  This is relevant because financial considerations bear on the defendant's motives for committing the conduct charged in the Information.

In his sentencing submission, the defendant asserts that he did not create the Obama Works for pecuniary gain.  See Def. Sent. Memo at 25.  The Government does not contend to the contrary.  However, the defendant came to recognize the extraordinary benefits that came to him -- in the form of both profits and reputational gain.  Thus, when the dispute with the AP arose in early 2009, the defendant had much to lose and, consequently, much to protect.

The Honorable Frank Maas
September 2, 2012
Page 3

      In the context of the civil litigation, there was a time-consuming dispute over the exact amount of the profits derived by the defendant and others from the works. Among other things, the parties disputed what expenses could be charged to the works and, as a result, what profits were derived. Experts retained by the parties in the civil case could not agree on the proper amount. For example, a forensic account retained by the AP calculated that the defendant earned gross profit of more than $1 million as a result of the Obama Works and that a licensee of the defendant's, Obey Clothing, earned approximately $988,000 as a result of the works. While the exact amount of profits derived by the defendant from the works and the timing of those profits need not be determined in connection with this criminal case, the PSR should not include the defendant's self-serving estimate of "modest" profits of $150,000, given the very substantial doubt about the accuracy of the figure.

      The PSR sets forth that, as a result of the Obama Works, the defendant was bestowed with various honors. The Government notes that, prior to the works, the defendant was a well-established artist. However, the works greatly contributed to the defendant's reputation as an artist and made his art known to a much wider audience than ever before. Among other honors achieved by the defendant as a result of the success of the Obama Hope Work and the Obama Progress Work were: (a) the defendant was selected to design the official poster of the 2009 inauguration of President Obama; (b) a hand-finished collage version of the Obama Hope Work was acquired by the National Portrait Gallery, which is one of the museums comprising the Smithsonian Institution, in early 2009; and (c) the defendant was commissioned to create the cover image of then-Senator Obama for TIME magazine's Person of the Year for 2008, which was displayed as part of an exhibition at the National Portrait Gallery.

      In addition to these reputational benefits arising out of the Obama Works, the defendant and companies controlled by him greatly increased their profitability after -- and as an indirect result of -- the Obama Works. For example, three entities controlled by the defendant (Obey Giant Art Inc., Obey Giant Art LLC, and Studio Number One Inc.) had combined gross profit (as reflected on these entities' tax returns as gross receipts less cost of goods sold) of the following amounts:

        2007:    $2,939,157
        2008:    $4,590,334 (note that the Obama Works were created in early 2008)
        2009:    $6,088,119 (note that President Obama was inaugurated in early 2009)

      None of this acclaim, for example, having a work in the National Portrait Gallery, would have come to the defendant without the Obama Works. Nor would a meaningful amount of these financial benefits have come to the defendant without the Obama Works. The dispute with the AP was not merely one in which the defendant sought to expand the outer contours of the fair use doctrine in copyright law, as the defendant seeks to portray. See Def. Sent. Memo at 5. Rather, the defendant had a substantial financial stake in winning the lawsuit or, at least, settling

The Honorable Frank Maas
September 2, 2012
Page 4

it on favorable terms. Thus, he had <u>both</u> an ideological <u>and</u> financial motive to commit the criminal conduct charged in the Information.

¶ **12 (page 5):** The PSR notes that the defendant retained counsel to represent him in the copyright dispute with the PSR, but does not note the terms on which counsel was retained. This issue is relevant because it partially explains the manner in which the defendant conducted the litigation.

Accordingly, the Government requests that the PSR note that, the defendant was initially represented in the civil case by the Stanford Fair Use Project, which is affiliated with Stanford Law School, and Durie Tangri, a California-based law firm. It appears that only the Stanford Fair Use Project represented the defendant <u>pro bono</u>. The Government's understanding is that Durie Tangri was compensated to some extent for its work in representing the defendant in the civil litigation and that it was compensated through insurance coverage that the defendant maintained. After the defendant's litigation misconduct was revealed, these attorneys withdrew and were replaced by Jones Day and a Harvard Law School professor, all of whom represented the defendant <u>pro bono</u> through the conclusion of the settlement with the AP.

In October 2009, after the defendant had been caught virtually red-handed engaging in substantial litigation misconduct, thereby forcing him to admit to the misconduct, the parties to the civil case engaged in a mediated settlement conference. All of the parties to the case at the time (the AP, the defendant, the defendant's clothing licensee, and the photographer who took the photographs at issue) together with their counsel attended a day-long settlement conference with a mediator. In addition to the parties and the mediator, counsel for an insurance company for the defendant, which would have contributed to any settlement, was also present.

At the outset of the settlement conference, counsel for the AP demanded in excess of $1.6 million to resolve the dispute. In response, the defendant offered to pay a mere $100,000 to resolve the dispute. The defendant, through his counsel, indicated, in substance, that the defendant would not pay anything more than $100,000, a figure that would not remotely have covered even the legal fees incurred as of that time by the AP as a result of the defendant's litigation misconduct. The defendant indicated no flexibility and no desire to engage in further negotiations. Had the defendant done so, the AP would easily have resolved the case for less than $1.6 million and would have done so without having to engage in more than a year of hotly contested litigation and incurring substantial attorney's fees. That the defendant himself would not bear any expense in continuing the litigation after his illegal conduct was revealed undoubtedly impacted his decision to not settle the case for many months after his conduct was revealed.

Far from the AP's being "deep-pocketed," as the defendant's counsel in the civil litigation describes them, <u>see</u> Def. Sent. Memo, Exh. 30 at 2, the AP was incurring substantial legal fees in the litigation, unlike the defendant. And further unlike the defendant, the AP is a

The Honorable Frank Maas
September 2, 2012
Page 5

not-for-profit entity.  See Information ¶ 8.  It should also be noted that the AP engages in a substantial public service: gathering and disseminating the news.  The AP is a cooperative owned by its members -- American newspapers and broadcasters -- and, in furtherance of its public service, employs thousands of journalists and editors in hundreds of locations around the world.

**¶ 42 (page 12):** The PSR notes that the AP and the defendant reached a settlement whereby the defendant would pay the AP $1.6 million, but does not note the source of the payments.  The amount of the settlement and the source of the payments is relevant because, as part of his argument for a non-incarcerative sentence, the defendant notes that the settlement terms were "onerous."  Def. Sent. Memo at 27.  The Government understands that a significant portion of the settlement, believed to be approximately $450,000, was made by an insurance company that insured the defendant and/or one of more of the defendant's companies.  It appears, therefore, that approximately 28% of the settlement was paid by a source other than the defendant.  Nor, as noted above, did he incur any attorney's fees in pursuing the litigation.

**¶¶ 51-52  (page 13):** The PSR contains some information regarding the defendant's criminal history.  The Government notes the following additional information, which is relevant because it makes clear that the defendant's illegal conduct occurred, in part, while he was on probation in Massachusetts.

On or about July 10, 2009, the defendant was convicted, upon a plea of guilty, of one count of defacing property, in violation of Massachusetts General Law ch. 266, § 126A.  This conviction arose out of an arrest on or about September 16, 2000.  Also, on or about July 10, 2009, the defendant was convicted, upon a plea of guilty, of two counts of wanton destruction of property under $250, in violation of Massachusetts General Laws ch. 266, § 127.

The two July 10, 2009, guilty pleas were for separate offenses and the separate cases were consolidated for sentencing.  Both cases arose out of the defendant's posting works of art on property without permission.  The defendant was sentenced principally to 2 years' probation on both cases.

Accordingly, in considering whether specific deterrence is required, it is crucial to note that the defendant engaged in a substantial portion of the criminal conduct charged in the Information and described in the PSR while he was on probation for these two Massachusetts offenses.

The Honorable Frank Maas
September 2, 2012
Page 6

## II.     On the Unique Facts of this Case, A Prison Sentence is Appropriate

The Governments submits that a prison sentence is appropriate because such a sentence adequately balances all of the factors that the Court is required to consider under Section 3553(a).

The defendant engaged in extraordinarily serious litigation misconduct such that a prison sentence is appropriate.  In sum, the defendant deleted documents that he knew, when used as evidence, would demonstrate that one of the key factual allegations in a civil copyright complaint, which was filed on his behalf and related to by far the most famous work of art that he had ever created, were demonstrably false.  The defendant also created fake evidence that he intended to use, and in fact did use, to show that the false factual allegations in his complaint were true.  The District Judge before whom the civil case was pending described this as unlike anything he had ever seen.  He also proffered as witnesses two people who he knew would testify to a fact (which photograph the defendant had referenced in creating the Obama Works) that the defendant knew was untrue.  See PSR ¶¶ 27-29, 32.  And, finally, the defendant took a step towards creating a backdated document retention policy to explain why electronic documents were not produced to the AP, a proposed plan that he shortly abandoned.  See PSR ¶¶ 34-35.  The motives behind the defendant's illegal conduct were to mislead his adversary in the copyright litigation and to subvert the truth-finding function of the litigation that he himself initiated.  And much of the defendant's criminal conduct occurred while he was on probation in Massachusetts.

On the basis of these facts, the Section 3553(a) factors that suggest that a prison sentence is appropriate are: "the nature and circumstances of the offense"; "the need for the sentence imposed" "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; and "the need for the sentence imposed" "to afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(1-2).

The defendant's conduct was also extraordinarily willful, again providing a solid basis for the Court's finding that a prison sentence is appropriate.  This was not a mere failure to preserve documents, which is the typical form of spoliation seen in civil cases.  This was the intentional destruction of evidence and the intentional manufacture of false evidence.  The defendant knew exactly what he was doing when he created the Fake Documents and sought to destroy the Deleted Documents.  He engaged in this initial conduct in direct response to the AP's allegation that the defendant had "deliberately misrepresented the source of the Infringing Works in [the defendant and his company's] Complaint."  Specifically, the AP alleged in response to the defendant's civil complaint that "although [the defendant and his company] were well aware that the [Obama Works] were based on the Obama Photo, [the defendant and his company] deliberately misidentified in their Complaint another photo taken by [a photographer], which included an image of the actor George Clooney seated next to President Obama (the Clooney Photo) as the source of the Infringing Works."  See PSR ¶¶ 22-24.

The Honorable Frank Maas
September 2, 2012
Page 7


      Given the several weeks over which the initial document destruction and the fake document manufacturing unfolded, it cannot be dismissed as remotely impulsive or the product of a moment of bad judgment.  See PSR ¶ 23.  Nor can it be explained in the simplistic manner that the defendant seeks to employ in his sentencing brief and in various letters regarding his character that he appends to it:  as the product of "foolish[ness]," "stupid[ity]," and a mere "lapse in judgment," Def. Sent. Memo at 5-7, 26-27.

      Nor can the defendant's conduct be dismissed as the product of a lay understanding of the civil discovery process.  By the time that the defendant destroyed documents and created fake ones, the defendant had been advised in detail by his then-counsel of his various obligations to preserve litigation-related documents.  And some of his evidence destruction and manufacturing of evidence occurred practically immediately before he met with his counsel to discuss document preservation, reflecting his desire to hide the true facts and his conduct from his counsel in the civil case.  See PSR ¶¶ 21, 23-24.

      Moreover, during the next seven months and before the defendant's illegal conduct was revealed, the defendant repeatedly lied to his lawyers about the true facts, knowing that his false statements were being used to advance his litigation position and knowing that his deceit was substantially impacting the litigation.  And, after the initial evidence destruction and evidence manufacturing, the defendant engaged in further litigation misconduct: proffering witnesses who would support his factually untrue complaint and seeking to have a back-dated document retention policy created, so as to justify why documents that he sought to destroy were not available to be produced to the AP in the litigation.  The defendant's illegal conduct occurred over months, not over a few isolated moments.  The length of time over which the defendant conduct occurred also supports a prison sentence.

      The defendant's illegal conduct had serious financial consequences for the AP, also providing a solid basis for the Court to find that a prison sentence is appropriate.  As a result of the defendant's illegal conduct, the AP incurred substantially more than $1 million of legal fees that, but for the illegal conduct, it would not have had to incur.  While the AP knew virtually immediately that the defendant's initial complaint was false, see PSR ¶ 22, it had to spend more than $1 million demonstrating -- in the face of the defendant's repeated claims to the contrary -- that his complaint was false and forcing the defendant to admit that his complaint was false.  That process was a time-consuming and, therefore, costly one, given the defendant's repeated insistence that he used the Clooney Photograph as a reference to create the Obama Works, and not the Obama Photograph.  (The AP also had to spend significant time ensuring that all of the defendant's misconduct was revealed, once it had uncovered the evidence destruction and evidence manufacturing.)  The fact that the AP was not mislead by the defendant's false complaint as to which photograph the defendant referenced in creating the Obama Works advanced by the defendant in mitigation, see Def. Sent. Memo at 8 & n.7, 27, is relevant.  Rather, the much more important point is that, in the face of the defendant's several acts of

The Honorable Frank Maas
September 2, 2012
Page 8

litigation misconduct and his repeated insistence that his complaint was true and that the AP's allegations were false, the AP had to expend great resources to prove that the defendant's complaint was false.

Another reason why a prison sentence is called for in this case is because the civil litigation process of dealing with litigation misconduct was not employed. In the context of the civil litigation between the defendant and the AP, there was no sanction -- <u>i.e.</u>, penalty -- imposed upon the defendant for his litigation misconduct. While the defendant agreed to a settlement, the settlement put the AP back into the position that it would have been, but for the defendant's misconduct and arguably settled the copyright claims for little or nothing. The defendant, however, was not <u>penalized</u> for his misconduct.

The utter lack of any sanction to the defendant in the course of the civil litigation is all the more remarkable in light of the initial indications by the District Judge before whom the civil case was pending that there <u>would be</u> a sanction imposed upon the defendant and that the District Judge would <u>not</u> permit a settlement of the defendant's illegal conduct. Specifically, when initially presented with the facts concerning the defendant's misconduct in November 2009, the District Judge's view was as follows:

> [The allegations of litigation misconduct] are serious enough that I'm not going to let you [his substitute counsel] get away from it or Mr. Fairey get away from it, but in due time. The case is not going to go away. <u>And if the case is settled in some fashion, I don't want this issue to be settled</u>. . . . <u>Because I will not approve settlement with this issue wrapped into a settlement</u>.
>
> . . . .
>
> I want this case to be concluded on the merits and then we'll get into this. I promise you, [the AP's counsel], we will get into this issue. I'm not forgetting. I've not seen in practice -- I was going to add up the number of years, but I'll spare you that -- I have not seen in practice anything like this. I consider it serious. <u>And I'm serious when I say it will not be wrapped into any settlement that I approve</u>.

<u>Fairey v. The Associated Press</u>, 09 Civ. 1123 (AKH), 11/10/09 Tr. at 12-13 (emphasis added). Notwithstanding this initial reaction by the District Judge, he approved the parties' January 2011 settlement agreement without comment and without the parties' having provided any explanation as to why it was appropriate for the defendant's illegal conduct to be resolved as part of the settlement. By the time of the civil settlement, the parties and the District Judge had become aware of the criminal investigation, although there is no indication that the District Judge chose to forego a civil sanction in favor of a criminal one.

The Honorable Frank Maas
September 2, 2012
Page 9

   Even the settlement agreement itself distorts to some extent the truth-finding function of the court.  In the negotiations that led to the settlement agreement, the defendant absolutely insisted that, as a condition of any settlement, the AP stipulate that it "has been made whole for the fees and costs that it incurred as a result of the spoliation and fabrication of evidence in the [civil case] and that [the AP] will not seek further civil or criminal action or penalty against [the defendant and various entities associated with the defendant]."  That is, the settlement agreement virtually ties the hands of the AP in connection with a criminal case that, at the time of the settlement, the defendant was well aware might be brought.  Thus, even if the victim of the defendant's illegal conduct believes today that a prison sentence is the appropriate sanction, it is precluded by the terms of its settlement agreement from so stating.

   All the defendant was required to do by way of his criminal conduct as part of the settlement agreement was remediate the financial effects of his criminal conduct.  Given the very substantial fees incurred by the AP in relation to the misconduct, both before and after it came to light, the defendant arguably settled the copyright claims for nothing in agreeing to pay the AP $1.6 million.

   A sentence without any term of imprisonment sends a terrible message to those who might commit the same sort of criminal conduct in which the defendant engaged.  The message sent by a sentence without any term of imprisonment is that, if a party who engages in spoliation and fabrication of evidence does not get caught, it unfairly gains.  And, if it does get caught, then it will merely be required to remediate the effects of its conduct with no marginal sanction.  Encouraging parties to game the civil litigation system in this fashion creates terrible incentives and subverts the truth-finding function of civil litigation.  The defendant submits that a prison sentence will deter those who engage in spoliation from "com[ing] clean" and that, instead, they would be "driven deeper underground."  Def. Sent. Memo at 30.  The Government submits that the paramount consideration is how to deter parties in civil litigation from engaging in this sort of conduct in the first place, not in guiding them how to rectify such misconduct.  A prison sentence -- even a short one on the order of a couple of months -- sends an appropriately stiff message of deterrence.

   As this Court has previously noted, "[t]he doctrine of spoliation has . . . assumed greater importance in recent years as more information has come to be created and stored electronically.  Although a recent study confirms that spoliation motions are becoming increasingly common in federal litigation in the era of e-discovery, the absolute number of spoliation motions remains quite small."  <u>Genon Mid-Atlantic, LLC v. Stone & Webster, Inc.</u>, No. 11 Civ. 1299 (HB) (FM), 2012 WL 1414070, *6 (S.D.N.Y. Apr. 20, 2012).  The Government submits that this is not only because, as this Court has noted, "not every failure to preserve electronic evidence constitutes sanctionable spoliation," <u>id.</u>, it is also because spoliation is difficult, time-consuming, and expensive to prove, as it was in the defendant's civil case.  The Government also submits that the absolute number of spoliation motions reflects that this conduct frequently goes undetected.

...

The Honorable Frank Maas
September 2, 2012
Page 10

      When it is detected, there is a subset of litigation misconduct that rises to the level that a criminal prosecution is appropriate. In the Government's view, the defendant's conduct, combined with the utter lack of sanction for the defendant in the civil case, rose to the level that a criminal prosecution was warranted. That the Government chose, in its discretion, to prosecute the defendant for a misdemeanor should not suggest that the Government did not regard the defendant's conduct as extraordinarily serious. Rather, the Government's choice reflected, among other things, the view that the defendant should not be exposed to more than 6 months' imprisonment.

      Commenting on the perceived lack of criminal prosecutions for illegal conduct in the course of litigation, the defendant suggests that a custodial sentence will create an "unwarranted disparity" between the defendant and "most people who spoliate documents during civil litigation." Def. Sent. Memo at 34-36. The Court should reject this suggestion. First off, even the District Judge before whom the civil case was pending remarked on the extraordinary nature of the defendant's conduct, noting that he had "not seen in practice anything like this." To the extent others have not been prosecuted for this type of conduct, the Government submits that it is because their conduct has not come to the attention of prosecutors or because the conduct was not as bad as the defendant's.

      Moreover, the defendant's argument reflects an incorrect understanding of the law. What the Court is required to consider in sentencing the defendant is "the need to avoid unwarranted sentence disparities <u>among defendants with similar records who have been found guilty of similar conduct</u>." 18 U.S.C. § 3553(a)(6) (emphasis added). The Court is not required to consider the difference between the defendant and those who have not been found guilty of, or even charged with, similar conduct. This is not only the law, it is also supported by commonsense. If the Court were required to consider how uncharged people are treated, it would, in essence, permit those charged with serious criminal conduct to argue that they were merely among the "unlucky" few to be caught and, therefore, should receive a lesser criminal sanction. This is a particularly dangerous message to send in cases involving difficult to detect or underenforced crimes. <u>Cf.</u> U.S.S.G. ch. 2, part T (intro. cmt.) ("[b]ecause of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.").[1]

---

[1] The defendant claims that there exists "sparse evidence of defendants being charged with crimes for spoliating in the context of a civil case" because it found few reported opinions involving such conduct. Def. Sent. Memo at 34-36. This is an incorrect baseline and a wildly underinclusive set of data from which to make this sweeping assertion. What is more applicable as a comparison are defendants who are prosecuted for crimes, by whatever name, that involve obstruction of justice and, within those cases, document destruction or extensive conduct. As to those sorts of cases, in 2010, there were 170 federal criminal cases in which U.S.S.G. 2J1.2 was

The Honorable Frank Maas
September 2, 2012
Page 11

On the subject of how the defendant's criminal conduct was detected, the defendant's recitation of the relevant facts glosses over much and the suggestion is that somehow, one day, the defendant just decided to come clean about his criminal conduct.  See Def. Sent. Memo at 8-9.

But that was not remotely what happened.  In the defendant's initial document productions in the civil case, there was a stark lack of documents concerning the source of the reference photo.  In response and in light of the defendant's allegation about the reference photo used to create the Obama Works, AP's counsel continued to question the absence of such documents.  The defendant falsely sought to ensure the AP, through his counsel, that "we looked EVERYWHERE the files could have been."  See PSR ¶ 36.  It was only because the AP's counsel continued to press, in the face of resistance by the defendant and his counsel for more complete document productions, and ultimately demanded that there be a forensic examination of computers controlled by the defendant, that an employee of one of the defendant's companies searched and found the documents that the defendant had sought to delete, which were then turned over to the defendant's counsel.  See PSR ¶¶ 38-39.  Only then, when the true facts had begun to come out, did the defendant admit what had occurred.  His admissions were not the result of contrition, a change of heart, or an effort to right a wrong.  They were the product of his having been caught red-handed.

Finally, the defendant suggests that a claimed damage to his reputation counsels that a prison sentence is unwarranted.  See Def. Sent. Memo at 28.  In doing so, he claims that he has been "he has been pilloried in the press and blogs." Id. at 12.  The Court should reject this as a reason for a lower sentence as it would, in essence, result in "famous" people being sentenced more leniently than those who are unknown, but engage in the same conduct.  This is surely a disparity that is unwarranted.

Moreover, it is somewhat ironic that the defendant now refers to his great attentiveness to the press and blogs.  The defendant's February 2009 civil complaint (relevant pages attached hereto as Exh. C) referred to press and blogger efforts to determine what photograph the defendant had used as a reference and describes it as a "mystery."  See Exh. C at ¶¶ 29-33.  The civil complaint then specifically denied what a photographic critic had concluded -- that the defendant had used a specific image of then-Senator Obama (the "Obama Photo"), see Exh. A, as

---

employed.  Section 2J1.2 applies to obstruction of justice-type crimes and is the Guideline that would determine the applicable Sentencing Guidelines range if the Sentencing Guidelines applied to this case.  About 10 of these 170 cases involved the destruction of documents.  See United States Sentencing Commission, Use of Guidelines and Specific Offense Characteristics -- Fiscal Year 2010, available at www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/ Guideline_Application_ Frequencies/2010/10_glinexgline.pdf (relevant pages attached hereto as Exh. B).  Statistics in prior years are to like effect.

The Honorable Frank Maas
September 2, 2012
Page 12

a reference.  <u>See</u> Exh. C at ¶ 34.  Instead, the defendant alleged that he used as a reference an entirely different photo, the Clooney Photo, <u>see</u> Exh. A, as a reference.  As is now clear, the complaint was false; the defendant used the Obama Photo, and not the Clooney Photo, to create the Obama Works.

But he chalks the false complaint up to his honestly mistaken belief, held at the time of the filing of the civil complaint, that the Obama Photo was a crop (a subset) of the Clooney Photo.  <u>See</u> Def. Sent. Memo at 3-6.  In doing so, he asserts that "[b]efore the litigation began, [the defendant] had never compared the Clooney Photo and the Obama Photo, which contain nearly identical images of then-Senator Obama and were taken moments apart.  He never had a reason to review the Clooney Photo -- let alone compare it to the Obama Photo -- after he decided not to use it."  <u>Id.</u> at 4-5.

Commonsense and the facts belie these unproven factual statements.  This was the defendant's most famous work of art.  It had brought him enormous, nationwide acclaim in a way that he never had before.  He had been specifically asked by the press about the source of the reference image.  Bloggers widely speculated about the source of the reference image.  And the speculation was specifically brought to his attention.  Yet the defendant now suggests that he did not pay sufficient attention to the press or bloggers at that time and, as a result of these inquiries, never checked on what image he had, in fact, used.  <u>See</u> Exh. C at ¶¶ 39-32.  He has the uniquely discerning eye of a highly skilled artist and the differences between the Obama Photo and Clooney Photo are obvious even to a lay person.  <u>See</u> Exh. A.  The draft of the civil complaint, which he reviewed paragraph by paragraph with his counsel, <u>see</u> PSR ¶ 20, specifically raised the issue of the difference between the Obama Photo and the separate Clooney Photo.  <u>See</u> Exh. C at ¶¶ 14-15, 18, 33-34.  Yet, he still claims that the false complaint was the product of an honest mistake.  While the Government does not contend that the defendant <u>knowingly</u> filed a false civil complaint, the Government submits that the defendant was, <u>at the very least, reckless</u> as to the truth of the civil complaint's allegation that he had used the Clooney Photo to create the Obama Works.  That the false complaint was an honest mistake made in complete good faith is preposterous.

The Government submits that, after balancing all of the factors required to be considered under Section 3553(a), the Court should impose a term of imprisonment.  Under the unique circumstances of this case, a sentence that does not involve some loss of liberty in the form of incarceration does not adequately factor all of the Section 3553(a) factors.

### III.  <u>The Government Does Not Seek Restitution</u>

The Government does not seek restitution in this case.  As the PSR notes, <u>see</u> PSR ¶ 41, the AP and the defendant settled the civil case.  In the settlement agreement, the AP agreed that it had "been made whole for the fees and costs that it incurred as a result of the spoliation and fabrication of evidence in the" civil case.  More important than this settlement term, the payment

The Honorable Frank Maas
September 2, 2012
Page 13

provided for by the settlement ($1.6 million to be paid in periodic installments) was not allocated between compensation to the AP for: (1) fees and costs paid to the AP to make it whole for the defendant's criminal conduct; and (2) copyright infringement by the defendant. As a result, it cannot be determined that the AP has suffered an uncompensated loss.

## IV. The Court Can Fine the Defendant Up to $3.2 Million and Should Impose a Fine

The defendant contends that no fine should be ordered. Def. Sent. Memo at 38-39. The Government submits that, whether it sentences the defendant to a term of imprisonment or not, the Court should impose a fine. By virtue of the alternative fines provision, the Court has substantial latitude in fashioning a fine in addition to any prison term or as an alternative to imprisonment. The Court may impose a fine of up to $3.2 million.

Section 402, together with Section 3571(b)(6), provides for a fine up to $5,000, which can be made payable to the AP as the victim of the defendant's criminal conduct and/or the United States. The maximum portion of the fine payable to the United States is $1,000. In addition, the alternative fines provision, Section 3571(d), provides for, among other things, a fine of not more than twice the gross pecuniary loss to a person other than the defendant. Section 3571(d) does not indicate that the fine should be payable to the complainant, as does 402.

In this case, the Court can order a fine up to $3.2 million. This is because, in his plea allocution, the defendant admitted, among other things, that he "ultimately settled [his] case with the AP and paid the AP an amount that [he] believe[s] made it whole for the harm associated with [his] spoliation and fabrication of evidence." 2/24/12 Tr. at 19-20. And what the defendant agreed to pay was $1.6 million. See PSR ¶ 41 & p.1. And given the defendant's financial circumstances -- net worth of over $6.8 million, much of which is in the form of cash and certificates of deposit, and very substantial pre-tax income between 2008 and 2010, see PSR ¶¶ 76, 80 -- the defendant clearly has the ability to pay even a substantial fine.

In seeking that no fine be imposed, the defendant notes that the AP seeks no further sanction. See Def. Sent. Memo at 27. He points to the settlement agreement between the parties, which provided that the AP would not seek any further sanction against the defendant. Of course, the settlement term does not bind the Court. Many factors went into the choice of the AP to settle the case and accept, as a term, that the AP not seek further sanction. Among others, the AP would, without a settlement, continue to bear the burden of costly litigation, unlike the defendant who was represented pro bono. The litigation had a substantial toll on the AP (beyond the financial ones). The AP was forced to defend itself as an institution, which, according to the AP, entailed significant financial, emotional, and reputational costs to the AP and its employees, some of whom spent years working on the litigation even after the defendant's misconduct was revealed. In short, this specific settlement term bears little relevance to the Court's decision regarding whether a fine is appropriate.

The Honorable Frank Maas
September 2, 2012
Page 14

## V.  The Defendant's Medical Condition Can Be Adequately Cared for by the BOP

The defendant asserts that a prison sentence will preclude him from continuing his treatment regime for Type I diabetes. He also seeks a lower sentence because adequately caring for his diabetes may result in incarceration at a higher security facility than might otherwise be appropriate if he were not diabetic. <u>See</u> Def. Sent. Memo at 31-34.  The Government wishes to consult further with the Bureau of Prisons concerning its response to these assertions. The Government expects to respond in detail at sentencing regarding this issue.

## VI.  Conclusion

For the reasons set forth below, the Court should sentence the defendant to some term of imprisonment and should also impose a fine.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____/s/_____
Daniel W. Levy
Assistant United States Attorney
Telephone: (212) 637-1062

Attachments (Exh. A-C)

cc:   Daniel M. Gitner, Esq. (by ECF)
      Lankler Siffert & Wohl LLP

**CERTIFICATE OF SERVICE**

I, Daniel W. Levy, declare under penalty of perjury that:

1. I am an Assistant United States Attorney for the Southern District of New York.

2. On September 2, 2012, I caused a true and correct copy of the foregoing GOVERNMENT'S SENTENCING MEMORANDUM, together with the exhibits thereto, to be served by Clerk's Office Notice of Electronic Filing upon the following attorney:

> Daniel M. Gitner, Esq.
> Lankler Siffert & Wohl LLP
> Counsel for Defendant Shepard Fairey

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   September 2, 2012
         New York, New York

\_\_\_/s/_____
Daniel W. Levy
Assistant United States Attorney
Telephone:  (212) 637-1062